A. Dean Bennett (ISB #7735)
Alexandra S. Grande (ISB #9566)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702
Telephone: (208) 342-5000
Facsimile:  (208) 343-8869
adbennett@hollandhart.com
asgrande@hollandhart.com

Michael L. Banks (Admitted *Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-2921
Telephone:  (215) 963-5387
michael.banks@morganlewis.com

*Attorneys for Defendant Red Hat, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLAN KINGSLEY WOOD, an individual, | ) Case No. 2:24-cv-00237-REP |
| Plaintiff, | ) |
| v. | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **DEFENDANT'S MOTION TO** |
| RED HAT, INC., a North Carolina | ) **COMPEL ARBITRATION AND STAY** |
| corporation and subsidiary of IBM, | ) **PROCEEDINGS** |
| Defendant. | ) |

Defendant Red Hat, Inc. ("Red Hat") submits this Memorandum in Support of its Motion

to Compel Arbitration ("Motion") in the above-referenced matter and to stay these proceedings

pending the completion of the arbitration. This Memorandum is supported by the Declaration of

Jack Blondin. For the reasons supplied herein, the Court should grant the Motion.

# I.    INTRODUCTION

Plaintiff Allan Kingsley Wood asserts claims of race and gender discrimination, retaliation, and violations of the Family Medical Leave Act ("FMLA") arising from the termination of his employment with Red Hat in July 2023. His claims are subject to compulsory arbitration.

Since 2022, Mr. Wood electronically accepted Red Hat's sales incentive plans' terms and conditions that included, among other things, a clear arbitration agreement. By accepting and participating in Red Hat's 2022 and 2023 sales incentive plans, Mr. Wood agreed to arbitrate any and all disputes or controversies he had with Red Hat, including all disputes or controversies relating to or arising from his employment with Red Hat. He also agreed that any question of whether such a dispute or controversy was arbitrable would be decided by an arbitrator, not a court. This Court should compel the arbitration of Mr. Wood's claims and stay all proceedings pending the completion of the arbitration.

# II.    STATEMENT OF FACTS

## A.    Red Hat's Process for Review and Acceptance of Its Sales Incentive Plan(s).

Red Hat's sales employees are eligible for incentive compensation in addition to their base salaries. *See* Declaration of Jack Blondin, ¶ 4 ("Blondin Decl."). Red Hat calculates sales incentive compensation based on individualized sales quotas and sales incentive assignments. *Id.* Each sales employee receives an Individual Plan Document setting forth individual sales quotas, incentive assignments, and target incentive compensation. *Id.* ¶ 5.

As a condition of eligibility for incentive compensation, Red Hat employees must agree to participate in an applicable sales incentive plan. Plans are made available for inspection, and sales employees must confirm participation by accepting the terms and conditions electronically. *Id.* ¶ 6. For example, in 2023, the employee review and acceptance process was as follows:

- When an employee's Individual Plan Document was created, Red Hat sent an email to the employee with a link to the Sales Incentive Plan, including both the Individual Plan Document and the Terms and Conditions.

- Upon clicking the link provided in the email, the employee was brought to a page containing a summary plan document, which identified the name of the plan, the version, and when it was deployed. The page provided a link to the actual Sales Incentive Plan.

- Once the employee clicked the link to the Sales Incentive Plan, the employee was provided a copy of the Sales Incentive Plan Document. The employee was also provided a link to the Terms and Conditions document (and, upon clicking this link, the employee was provided a copy of the entire Terms and Conditions document).

- After reviewing the Sales Incentive Plan and Terms and Conditions, the employee had two options: either accept or deny the Sales Incentive Plan. The employee had to return to the summary plan document page, which contained a drop-down menu at the top right corner. This drop-down menu provided two options: accept or reject.

- The employee's choice—either to accept or reject the Plan—was then digitally recorded within a data table in Red Hat's customer relationship management ("CRM") system. Employees' choices are retained in the data table by Red Hat. This data table provides, for example, the name of the Sales Incentive Plan, the date it was created/available for review, whether it was accepted or denied, and the date on which that occurred.

*See id.* ¶¶ 7-12. In prior years, the electronic review and acceptance process was substantially similar the 2023 review and acceptance process. *See id.* ¶ 13.

B.    **Mr. Wood's Arbitration Agreement with Red Hat.**

In 2015, Red Hat hired Mr. Wood as a Senior Sales Director. Beginning in 2022, Mr. Wood participated in a Red Hat sales incentive plan that contained an arbitration agreement. Each time he participated, he was required to accept the Sales Incentive Plan and agree to compulsory arbitration of all disputes arising from the employment relationship. *See* Blondin Decl. ¶ 14. Most recently, Mr. Wood was presented with the CY23 Specialists NA COMM, Manager Plan, which he accepted electronically on March 30, 2023. *See id.* ¶¶ 14-15. The 2023 plan contained the following arbitration provision:

**PART III: ADDITIONAL PROVISIONS**

2.    **Dispute Resolution Procedure.**

a)    **Disputes.** The procedures set out in this Part III, Section 2 govern any and all disputes or controversies between Participant and the Company ("Dispute"), including but not limited to, disputes relating to or arising from i) the Company's Plan, ii) the Participant's eligibility for, participation in, or payments under the Plan or any previous sales incentive plan, iii) the interpretation, validity, construction, performance, breach, or termination of this Plan or previous sales incentive plans and supporting documents, or (iv) Participant's employment with the Company.

b)    **Payment Disputes.** []

c)    **Arbitration for United States Employees Only**

i)    By executing the Acknowledgment Form, each Participant who is employed in the United States agrees that any Dispute, including but not limited to a Payment Dispute, shall be conducted in accordance with the Employment Arbitration Rules (the "Rules") then in effect of the American Arbitration Association ("AAA"), a copy of which is available on-line at www.adr.org or, if you are unable to access the Rules, a copy can be provided to you upon request. The arbitration shall be held in Raleigh, North Carolina, unless another city is mutually agreed upon by the parties and shall be before a single neutral arbitrator selected by mutual agreement. If the parties cannot mutually agree upon an arbitrator, the arbitrator shall be chosen in accordance with the arbitrator selection process set forth in the Rules.

ii)    The arbitrator must be a member of the AAA Employment Roster and have experience in employment law.

iii)     The arbitrator shall have the power to award any type of legal or equitable relief, including injunctions. Awards shall include the arbitrator's written reasoned opinion, including the arbitrator's essential findings and conclusions on which the award is based. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Any relief or recovery to which the parties may be entitled shall be limited to that awarded by the arbitrator. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

iv)     Except where prohibited by applicable law, the arbitrator shall apply North Carolina law to the merits of any Dispute, without reference to its conflict of law rules. The arbitration proceedings shall be governed by the Federal Arbitration Act and by the Rules, without reference to state arbitration law. The arbitrator shall enforce any applicable statutes of limitations or repose or other deadlines applicable to the Disputes, including the Accrual and sixty-day requirement applicable to Payment Disputes provided for in Part III, Section 2(b) above, except where prohibited by applicable law.

v)     The parties agree that the arbitrator may not consider a Dispute of more than one Participant in a proceeding, may not join or consolidate or join the Disputes of any other party or Participant into a single proceeding and may not preside over any form of a consolidated, representative or class proceeding, including proceedings under the AAA Supplementary rules for Class Action Proceedings. The Arbitrator is not authorized to grant relief that would affect parties who are not parties to the arbitration.

vi)     To the extent necessary to enforce the terms of this Agreement, including to compel Arbitration, Participant hereby expressly consents to the personal jurisdiction of the state and federal courts located in North Carolina.

vii)     Participant and Company agree that the obligations of this Part, including the obligation to arbitrate shall survive the termination of their relationship and shall remain binding on the Participant's heirs, trustees, guardians, agents or other persons authorized to act on Participant's behalf.

viii)     To the maximum extent permitted by law, Participant and the Company agree that all claims must be brought in a party's individual capacity, and that no Disputes may be initiated or maintained on a class action, collective action, or representative action basis either in court or arbitration. This means that neither party may serve or participate as a class, collective, or representative action representative involving Disputes either in court or in arbitration. No arbitrator under this Arbitration Agreement shall have any authority to hear claims on a class, collective, or representative action basis. Nothing in this Agreement will preclude Participant or the Company from testifying or providing information in a class action, collective action, or representative action.

*Id.*, Blondin Decl., Ex. 6 at 12-13.

**C.**     **Mr. Wood's Employment Is Terminated and He Initiates Legal Action in Court, Instead of Arbitration, in Violation of His Arbitration Agreement.**

On July 17, 2023, Red Hat informed Mr. Wood that his job was being eliminated and his employment would terminate. *See* Compl. ¶ 41. On May 8, 2024, Mr. Wood filed this lawsuit, claiming that Red Hat discriminated against him based on his race and gender, improperly denied him FMLA leave, and retaliated against him for his complaining about Red Hat's Diversity, Equity and Inclusion ("DEI") policies. *See generally* Dkt. 1 (Compl.).

## III.     LEGAL ARGUMENT

**A.**     **Whether Mr. Wood's Claims Belong in Arbitration Should be Decided by an Arbitrator, Not the Court.**

There is no real dispute that the parties entered into a binding agreement to arbitrate disputes relating to Mr. Wood's employment with Red Hat, including discrimination claims arising from the termination of that employment. The language of the plan is unambiguous, and Mr. Wood accepted the plan electronically. If, however, Mr. Wood contends that this case is not subject to compulsory arbitration, any such argument must be decided by an arbitrator, rather than this Court.

In determining the arbitrability of Mr. Wood's claims, this Court's inquiry is limited to just two questions: (1) is there a valid agreement to arbitrate; and (2) is there clear and unmistakable evidence that the parties agreed to delegate questions of arbitrability to the arbitrator? *See Henry Schein*, 139 S. Ct. at 530 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *see also Ashbey v. Archstone Property Management, Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015) (same). The answer to both of those questions is yes.

1.     <u>The Parties Entered into a Valid Arbitration Agreement.</u>

The validity of an arbitration agreement is generally a question of state law. *See Valenzuela v. Battelle Energy All., LLC*, 2023 WL 6808388, at *3 (D. Idaho Oct. 16, 2023). Here, the parties

agreed that North Carolina law governs this question. *See* Blondin Decl., Ex. 6, Part III(2) ("Except where prohibited by applicable law, the arbitrator shall apply North Carolina law to the merits of any Dispute, without reference to its conflict of law rules."); *id.* Part III(5) ("For employees in the United States only, the laws of the State of North Carolina shall govern this Plan, without regard for conflict of law provisions."). It is axiomatic that a signatory to a contract is bound by the terms of that contract. Mr. Wood assented to the contract and is therefore bound by those terms.

On March 30, 2023, Mr. Wood digitally accepted one of Red Hat's sales incentive plans and received incentive compensation in return for performing services for Red Hat in accordance with its terms. *See* Blondin Decl. ¶¶ 14-15. The Terms and Conditions of this 2023 sales incentive plan plainly mandate the arbitration of all disputes or controversies between Mr. Wood and Red Hat, including those centered on arbitrability and relating to or arising out of his employment with Red Hat. *See id.*, Ex. 6, Part III, Section 2(a).[1]

Should Mr. Wood attempt to claim he was unaware of the contents of the Terms and Conditions, those arguments fail. An elementary principle of contract law is that a party signing a written contract has a duty to inform himself of its contents before executing it. *Allen v. Reynolds*, 145 Idaho 807, 811 (2006) (the "rule in Idaho is well established that a party's failure to read a contract will not excuse his performance"); *Liebelt v. Liebelt*, 801 P.2d 52, 55-56 (Ct. App. Idaho 1990) ("a written contract cannot be avoided by one of the parties to it on the ground that he signed it without reading it and did not understand it; failing to read the contract or to have it read to him or to otherwise inform himself as to the true nature, terms and conditions of the contract constitutes

---

[1] Mr. Wood was informed of his termination in July 2023. *See* Dkt. 1 (Compl. ¶ 41). As the Supreme Court held in *Delaware State College v. Ricks*, discrimination claims accrue from the date the plaintiff is notified of the alleged adverse action. 449 U.S. 250 (1980). Accordingly, the sales incentive plan that Mr. Wood accepted on March 30, 2023 is the operative arbitration agreement.

nothing more than gross negligence on the part of that party and is an insufficient ground upon which to set the contract aside."); *Sydnor v. Conseco Financial Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001) (reversing lower court's denial of Motion to Compel Arbitration based on plaintiffs' claim that they did not know the contents of an agreement containing an arbitration clause) (citation and quotations omitted). Further, Idaho law has a strong public policy favoring arbitration and requires any doubt concerning the scope of arbitration to be resolved in favor of arbitration. *Lewis v. CEDU Educ. Servs.*, 135 Idaho 139, 144 (2000).

In addition, Mr. Wood's arbitration agreement is not limited to the duration of Mr. Wood's employment with Red Hat; in fact, the arbitration agreement expressly survives the termination of the employment relationship and remains binding on Mr. Wood. *See* Blondin Decl., Ex. 6, Part III, Section 2(c)(vii) ("Participant and Company agree that the obligations of this Part, including the obligation to arbitrate shall survive the termination of their relationship and shall remain binding . . ."); *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 201 (1991) ("If . . . parties who favor labor arbitration during the term of a contract also desire it to resolve post expiration disputes, the parties can consent to that arrangement by explicit agreement."); *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1062 (9th Cir. 2020) ("[I]t is illogical to conclude that upon expiration of the contract, the parties no longer intended" for these [arbitration] provisions to apply).

Mr. Wood's arbitration agreement is valid and enforceable in accordance with its terms. *See Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014) ("When the language of the arbitration clause is 'clear and unambiguous,' we apply the plain meaning rule to interpret its scope."). As the Supreme Court held in *Rent-A-Center W., Inc.*, such delegation agreements constitute independent and enforceable arbitration agreements:

Here, the 'written provision . . . to settle by arbitration a controversy,' . . . that Rent-A-Center asks us to enforce is the delegation provision[.] The 'remainder of the contract []' is the rest of the agreement to arbitrate claims arising out of Jackson's employment with Rent-A-Center. . . . Application of the severability rule does not depend on the substance of the remainder of the contract. Section 2 operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce. Accordingly, unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [a]greement as a whole for the arbitrator.

*Rent-A-Center, W., Inc.*, 561 U.S. at 71–72.

2. The Arbitration Agreement Clearly and Unmistakably Delegates Questions of Arbitrability to the Arbitrator.

Congress's "clear intent" in enacting the Federal Arbitration Act (the "FAA") was "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). Where an arbitration agreement delegates, "in clear and unmistakable" language, the question of arbitration to an arbitrator, a court may not override the agreement. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("[P]arties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence."); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, n.1 (2010).

Courts in the Ninth Circuit have held that "when the parties have incorporated by reference the rules of the American Arbitration Association ("AAA"), which state in relevant part that the 'arbitrator shall have the power to rule on his or her own jurisdiction . . .,'" the parties have "clearly and unmistakably" delegated issues of arbitrability to the arbitrator. *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017); *Loewen v. McDonnell*, 403 F. Supp. 3d 832, 838 (N.D. Cal. 2019) ("incorporat[ion] [of] rules that empower an arbitrator to decide issues of arbitrability . . . serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator").

The parties delegated all questions of arbitrability to the arbitrator. They did so in two ways. First, they incorporated the rules of the arbitral forum into their arbitration agreement, which grant arbitrators the power to determine their own jurisdiction. Second, the broad language of the contractual arbitration provision indicates an intent to submit arbitrability questions to the arbitrator.

> i.    *The Rules-Incorporation Language in the Arbitration Agreement Demonstrates the Parties' Intent to Delegate the Arbitrability Determination.*

An agreement's requirement that arbitration be conducted pursuant to AAA rules resolves the issue of whether the parties agreed to arbitrate issues of substantive arbitrability. *See Portland Gen. Elec. Co.*, 862 F.3d at 985. Here, Mr. Wood's arbitration agreement incorporates by reference the arbitral forum's rules—the AAA Employment rules— confirming the parties' intent to delegate questions of arbitrability to the arbitrators:

> By executing the Acknowledgment Form, each Participant who is employed in the United States agrees that any Dispute, including but not limited to a Payment Dispute, shall be conducted **in accordance with the Employment Arbitration Rules (the "Rules") then in effect of the American Arbitration Association ("AAA").**

Blondin Decl., Ex. 6, Part III, Section 2(c)(iv) (emphasis added). The AAA rules explicitly confer on arbitrators the power to decide whether and how to exercise jurisdiction over a case. *See* AAA Rule 6 (the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."), *available at* https://www.adr.org/sites/default/files/EmploymentRules_Web2119.pdf (last visited June 24, 2024).

"Virtually every circuit to have considered the issue has determined that incorporation of the [AAA's] arbitration rules constitutes clear and unmistakable evidence that the parties agreed

to arbitrate arbitrability." *Oracle Am., Inc. v. Myriad Grp*., A.G., 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *see also Simply Wireless, Inc. v. T-Mobile US, Inc*., 877 F.3d 522, 528 (4th Cir. 2017) ("[T]he explicit incorporation of JAMS Rules serves as 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability."); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("We agree with most of our sister circuits that the express adoption of these rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Awuah v. Coverall N. Am., Inc*., 554 F.3d 7, 11 (1st Cir. 2009) ("Rule 7(a) says plainly that the arbitrator may 'rule on his or her own jurisdiction' including any objection to the 'existence, scope or validity of the arbitration agreement.' This is about as 'clear and unmistakable' as language can get, meeting the standard we have followed."). Under these circumstances, the "court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529.

     ii.    *The Plain Language of the Agreement Demonstrates the Parties' Intent to Delegate Arbitrability Determinations to the Arbitrator.*

Separate from the arbitration agreement incorporating the AAA rules, the parties' use of a broad arbitration provision demonstrates an intent to delegate arbitrability determinations to the arbitrator. The following provisions of the arbitration agreement demonstrate that the parties agreed to delegate arbitrability to the arbitrator, not the court:

- "[A]ny and all disputes or controversies between [Mr. Wood] and [Red Hat], including but not limited to, disputes relating to or arising from . . . the Company's Plan . . . [and] the interpretation, validity, construction, performance, breach, or termination of this Plan" are to be arbitrated "in accordance with the Employment Arbitration Rules then in effect of the American Arbitration Association . . . ." Blondin Decl., Ex. 6 at Part III(2)(a), (c)(i).

- "The arbitration shall be held in in Raleigh, North Carolina . . . before a single neutral arbitrator selected by mutual agreement." *Id.* at Part III(2)(c)(i).

- "The arbitrator shall have the power to award any type of legal or equitable relief, including injunctions. Awards include the arbitrator's written reasoned opinion, including the arbitrator's essential findings and conclusions on which the award is based. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Any relief or recovery to which the parties may be entitled shall be limited to that awarded by the arbitrator. Judgment may be entered on the arbitrator's decision in any court having jurisdiction." *Id.* at Part III(2)(c)(iii).

In fact, courts have held that such provisions evidence an intent of the parties to delegate the question of arbitrability to the arbitrator. For example, in *Fed. Ins. Co. v. Metro. Transp. Auth.*, the Second Circuit held that "[t]he Contract uses 'any and all' language when it states 'parties to this Contract hereby authorize and agree to the resolution of all disputes arising out of, under, or in connection with, the Contract' through arbitration" and that such "language indicates that Federal and NYCTA 'clearly and unmistakably' required the issue of arbitrability to be decided by the arbitrator, not the court." *Fed. Ins. Co. v. Metro. Transp. Auth.*, 785 F. App'x 890, 892 (2d Cir. 2019) (citation omitted)). Mr. Wood's arbitration agreement has the same "any and all" language, stating that "any and all disputes or controversies between [Mr. Wood] and [Red Hat], including but not limited to, disputes relating to or arising from . . . the Company's Plan . . . [and] the interpretation, validity, construction, performance, breach, or termination of this Plan" are to be arbitrated "in accordance with the Employment Arbitration Rules then in effect of the American Arbitration Association. . . ." Blondin Decl., Ex. 6 at Part III(2)(a), (c).

Additionally, in *Rickenbaugh v. Power Home Solar, LLC*, the North Carolina Business Court held that the following language demonstrated an agreement of the parties that whether a dispute was covered by the agreement was to be decided by the arbitrator: "[A]ny dispute arising out of or relating to the negotiation, award, construction, performance or non-performance, or any aspect of this agreement, shall be settled by binding arbitration." *Rickenbaugh v. Power Home*

*Solar, LLC*, No. 19 CVS 244, 2019 WL 7018974, at *1 (N.C. Super. Dec. 20, 2019), *cert. dismissed Power Home Solar, LLC v. Rickenbaugh*, 142 S. Ct. 2855 (2022). Finally, in *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1064 (9th Cir. 2020), the Ninth Circuit held that the following language demonstrated an agreement of the parties that whether a dispute was covered by the agreement was to be decided by the arbitrator: "[A]ny' and 'all disputes' regarding the services provided and obligations pursuant to this Agreement" shall be settled by binding arbitration. As noted above, Mr. Wood's arbitration agreement has similar language. *See* Blondin Decl., Ex. 6 at Part III(2)(a), (c)(i).[2] Accordingly, the broad language of Mr. Wood's arbitration agreement is sufficient to show that the parties agreed to send the preliminary question of arbitrability to the arbitrator.

**B.    The Arbitration Agreement Covers This Dispute.**

The arbitration agreement's delegation of the question of arbitrability should end this Court's analysis under *Henry Schein*. If, however, this Court concludes that it must determine whether the underlying dispute is arbitrable, then that question is also easily answered. The claims asserted here plainly fall within the scope of the parties' broadly phrased arbitration agreement. *Robinson v. Bodily RV, Inc.*, 2020 WL 6449170, at *1 (D. Idaho Nov. 2, 2020) ("Any doubts about the scope of arbitrable issues are to be resolved in favor of arbitration."); *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) ("[T]he arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the

---

[2] As Red Hat's sales incentive plan's terms and conditions include Mr. Wood's arbitration agreement, the language addressing the "Company's Plan" clearly includes the arbitration agreement. *See* Blondin Decl., Ex. 6 at Part III(2)(a), (c)(i).

arbitrator."); *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 538 (5th Cir. 2019) ("Another way that parties can provide clear and unmistakable evidence that they intended an arbitrator to decide substantive arbitrability issues is by crafting a broad arbitration clause."); *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8 (1st Cir. 2014) ("This presumption is particularly appropriate where, as here, the arbitration clause is broadly worded.").

The arbitration agreement mandates binding arbitration of "any and all disputes and controversies between [Mr. Wood] and [Red Hat], ***including but not limited to***, disputes relating to or arising from . . . [Mr. Wood]'s employment with [Red Hat]." Blondin Decl., Ex. 6, Part III, Section 2(a) (emphasis added). This broad language encompasses all of Mr. Wood's race, gender, FMLA, and retaliation claims. And, the arbitration agreement contains a survival provision which extends the viability of the arbitration agreement past the termination of Mr. Wood's employment.

The FAA "requires courts rigorously to enforce arbitration agreements according to their terms[.]" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) ("Parties may generally shape such agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes. Whatever they settle on, the task for courts and arbitrators at bottom remains the same: to give effect to the intent of the parties." (citations omitted)). For all these reasons, this Court should enforce the parties' arbitration agreements in accordance with their terms.

To the extent there is any doubt concerning the scope of arbitration, such doubts "should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25; *Robinson* 2020 WL 6449170, at *1. If there was any doubt (which there is not), even Idaho ***state*** courts agree that arbitration is a contractual right and the question is simply, "is there an agreement to arbitrate

or is there not." *Shake Out, Ltd. Liab. Co. v. Clearwater Constr., Ltd. Liab. Co.*, 535 P.3d 598, 603 (Idaho 2023); *see also* Idaho Code § 7-901 (Idaho's Uniform Arbitration Act) ("a written agreement to submit any existing controversy to arbitration[,] or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable.").

In sum, this Court should compel arbitration.

## IV. CONCLUSION

Red Hat respectfully requests that the Court compel the arbitration of Plaintiff's claims and stay these proceedings pending completion of the arbitration.

Respectfully submitted this 29th day of July, 2024.

HOLLAND & HART LLP

By: */s/ Alexandra S. Grande*
A. Dean Bennett, of the firm
Alexandra S. Grande, of the firm

*- and -*

Michael L. Banks (Admitted *Pro Hac Vice*)
MORGAN, LEWIS & BOCKIUS LLP

*Attorneys for Defendant Red Hat, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of July, 2024, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kevin W. Roberts – kevin@robertsfreebourn.com
Chad H. Freebourn – chad@robertsfreebourn.com

/s/ Alexandra S. Grande
Alexandra S. Grande
of Holland & Hart LLP

32366033_v4